Oral argument not to exceed 15 minutes per side, Karen Kainbaum for the appellant. Good morning, your honors. Karen Kainbaum for Kathy Boyer, who is here today to present her case. Appealing the grant of summary judgment, dismissing her case because we believe that the judge's decision was in error. The court's very familiar with these kinds of cases where the totality of the circumstances are part of what should be evaluated, certainly by the judge, at the preliminary stage. When the standards are, as you've just heard, and you've heard many times, to look at the facts in the light most favorable to the non-moving party. As a result of what happened to Kathy Boyer in the women's prison in Ypsilanti, she has suffered a life sentence of disability, disfigurement, and pain. March 14, 2014, she fell out of her top cell. But we know the facts, and here's the question I want to start with so we can clear that up right away. Why is this not a civil matter rather than a constitutional problem? Does it not boil down to a claim of inadequate medical care or medical malpractice? Because the doctor, Judge, that's a good question. The doctor, Dr. Lacy, is the medical director at the facility, and it is clear, and he made it clear in his deposition, that he is the authority there. Well, I get that part. So he does act under color of law. Yes. This is a 1983 matter where you have... If dissatisfaction with a doctor acting under color of law has to rise to the level of being an unconstitutional breach, does it not? Well, that appeared to be the analysis of... So how could it get more than med mal? Well, actually, this is one of the things that very much concerned us about Judge Friedman's decision, is that he seemed to assess this as if it was a med mal case, and it really is not a medical malpractice case. It's a question of whether or not the treatment she received is a violation of the Eighth Amendment. And the standards for the violation of the standard of care under a medical malpractice action. It would be more rigorous? I believe that they're not even apples and oranges. I mean, I think they're apples and oranges. They're both fruit. They both deal with doctors' conduct being challenged, it's correct. But the standard of a doctor who is in charge of all of the health of all of the individuals in that prison is a different standard that he has. His standard is not only to uphold medical practice, but I believe he has to ensure that he isn't responsible for such acts as here, where it is seven weeks after her fall, before she... Your standard, I think what Judge Friedman is getting to, is what standard do you have to satisfy in order to show deliberate indifference under 1983? And I think you're rightly admitting that it's a difficult standard for you. It is a difficult standard. So tell us how this conduct rises to that level. There's some language in cases that talk about the treatment having to be woefully inadequate. Tell us why it's not malpractice, which would vitiate this claim, but it is, in fact, deliberate indifference. All right. I think I can do that pretty clearly. The Eighth Amendment prohibits the prison officials from unnecessarily inflicting pain on an inmate by acting with deliberate indifference to the inmate's serious medical condition. So there are a bunch of different prongs that of that general definition. Okay? Is there a serious medical condition? If somebody's got a cold, obviously that's not going to be what we're talking about. Here we have a person who had a commuted oblique fracture of her humerus. That's four breaks in her arm, and her shoulder was dislocated by the fall. It's serious enough that she's sent to the emergency room, and the emergency room does the preliminary diagnosis and provides medical instruction afterwards. I don't believe there's a dispute that this is a serious, serious medical situation. However, the second prong of... Well, the surgery for that wasn't indicated. The surgery for that was not precluded. Okay, not precluded, but it wasn't, in terms of deliberate indifference, the treatment that was applied, which was a sling and a... Well, Dr. Lacey today propounds that the sling was sufficient, and Dr. Lacey never saw this And what he did do is he did not follow the simple instructions from the emergency room that she be seen by an orthopedic surgeon, who is the proper person to evaluate whether or not surgery is in order. She was, in fact, not seen by an orthopedic surgeon for seven weeks, and by the time she saw the orthopedic surgeon, this oblique commuted fracture had begun to heal and callous over, and her shoulder was frozen, and it is today, and she has very little use of her arm. Do I know what... Dr. Lacey, I gather, was the doctor on call that night. He's the medical director, and he was on call, yes. He was on call, but another Dr. Johnson saw her a few days later. She was seen by another doctor, but the only person who had the authority to send her to is going to be Dr. Lacey, and he is the person who never in his deposition says, I'm not responsible for the care of this person. He's not simply on call, he's the medical director, and ultimately he did send her to an orthopedic surgeon, and when the orthopedic surgeon saw her, he said, it's too late to operate on this woman. Maybe if I had seen her earlier, then we would have operated on her, and she wouldn't have this. Today, you can feel the protrusion coming out of her arm. I don't know what they would have felt if they had seen her five days after her break, but we'll never know that, because Dr. Lacey decided in his own mind to ignore the objective, specific direction of the emergency room. So we believe that the question of whether or not a serious medical condition exists is clear. It was diagnosed by a physician, it mandated treatment, and it seems so obvious, even a lay person would know this. Since there was treatment, it just wasn't the treatment that the ER doc thought was the key. Since there was treatment, right, she got sent to the ER. You are correct, there is some level of treatment. She was looking for the standard of deliberately indifferent to her complaints. I understand that you can't be omniscient when you get an emergency room doctor's report, and Dr. Lacey assumed, for whatever reason, because he didn't examine this woman, that in fact the sling that they put on her... You're assuming that he would have done something different upon examination? I'm not going to assume anything about Dr. Lacey. I mean for your case. Do you have us needing to assume that had he looked at her, that would help show deliberate indifference? Because indeed, had he looked, he would have done something different than the other doctor from the prison who did examine her. I believe that if he had sent her to an orthopedic surgeon, that the orthopedic surgeon would have followed a path that would have given her a different treatment. But it's not just that he didn't examine her and didn't send her. He also didn't give her the medication that was requested. He didn't put her in the infirmary. She was in her cell on the second floor, laying on the floor and in a lower bunk, at least not in a top bunk, falling into a plastic chair. But she had an arm where she could not eat. No one was there to help her. You know who helped her in violation of prison rules? Other prisoners. They brought her Tylenol. They brought her Midol. They brought her food. They helped her walk down the stairs, because of course she couldn't balance herself with her arm, to wash her hair in the mop closet. The warden in charge of the floor asked Dr. Lacey to put her in the infirmary. He refused. He said she doesn't need it. It was a medical opinion, was it not? I don't believe it was a medical opinion. I believe it was an opinion based on deliberate indifference. I do not believe that when someone has visibly seen, you've had this background, you have all this evidence. It was very interesting. Supposedly she had a wheelchair that was going to give her mobility. I don't know if any of you have ever had the misfortune of being in a wheelchair. But if you have, you usually need both arms to run them. So this is another example of the doctor deliberately ignoring her medical condition, and it was serious. Finally, when you take a look at what happens after she sees the orthopedic surgeon, she is put in the infirmary. She is given pain medication. So I believe that all of this comes down to the simple question of, did the trial judge improperly grant summary disposition, when there should be material questions of fact as to the credibility of the evidence and the conclusions that Dr. Lacy made, which are totally self-serving. They ignore the credibility of Mrs. Boyer, who talks of her pain. They ignore the warden's recommendation that she be sent to the infirmary. They ignore the testimony of fellow prisoners who tried to come to her aid. And so we believe that since the totality of the circumstances are before you, that in a case like this, she should be allowed to argue that what she suffered was cruel and unusual punishment. I understand the doctor's defense. He said, well, I figured that she would just heal up fine. This is what he has said in his deposition. Their expert, who incidentally gave 800 opinions last year in support of insurance companies never once finding a person disabled, says, yes, Dr. Lacy's opinion was completely reasonable. Well, we are here to say accepting that evidence flies in the face of other facts which we believe the court did not sufficiently consider. So we ask here today that we have an opportunity to have a jury decide whether or not the disregard of the medical directives and all these other circumstances are such that she should be allowed to bring her case before the jury. I've reserved a couple minutes at the end, and I appreciate your questions. Thank you. Thank you for your argument. We will hear from your Cali-Anne, Carly-Anne Van Thome, right? Thank you. Good morning, Your Honors. Carly Van Thome on behalf of the appellee, Dr. Robert Lacy. Dr. Lacy was one of six physicians working at Women's Huron Valley Correctional Facility, part of the Michigan Department of Corrections, during the relevant time period. He had a very minimal role, actually, in the treatment of this injury. The fact that he was the senior physician on site is really irrelevant because contrary to Does the medical director have some additional role beyond the treatment of the patients assigned? A little bit. Supervising the other docs? He's not the boss of the other doctors. There's a regional medical director who is the supervisor for all of them. Do any of those people supervise the care administered by particular doctors? I'm just trying to find out whether counsel is making the point that he should have overseen what everyone is doing. No, and he testified that he did not keep tabs on what all the other doctors were doing. Her point would be that he was required to. No, that is not true. If he did become aware that someone was not being properly treated by another physician, as the senior physician, it would be appropriate for him to take some action to correct that, which is what he did later on in Ms. Boyer's case. But what appellant argues as to him being the only physician who could refer her to an orthopedic surgeon, that's absolutely not true. Dr. Johnson or any of the physicians on site could fill out the same form that Dr. Lacey eventually filled out down the road when he did refer Ms. Boyer to an orthopedic surgeon. That form would then go to the same office that it went to when Dr. Lacey sent it and be reviewed by one of the utilization management physicians, such as Dr. Squire, who did review Dr. Lacey's request. So Dr. Johnson could have done that. She evidently made the choice not to do that. Unfortunately, she didn't really document what her treatment plan was. She didn't order a follow-up x-ray. She didn't order a follow-up appointment with herself. I guess that's why, irrespective of who could send someone out to an orthopod, looking at this record, it seems to me that Dr. Lacey remained very much involved in her care. I'm looking at on the night she came in, he instructed the doctor to call in prescription medication and had other short-term orders. And then throughout the time she was there, it seems to me that the record reflects that he personally directed her medical treatment and ultimately himself is the one who scheduled the consultation six weeks after the injury. Viewing that in the light most favorable to Ms. Boyer, it seems to me that Dr. Lacey in fact rendered the medical care to her. This is the extent of his treatment. He was on call. He received word that there was a serious injury at the prison, and he said go ahead and send her to the emergency room, which occurred. When she returned later that evening, a nurse called him, not a doctor. A nurse called him for initial short-term orders to get her through the night, and then the next day she was to see a medical provider, which could have been Dr. Lacey, could have been any of the other physicians. It happened to be Dr. Johnson. At that point, it was Dr. Johnson's responsibility to determine Ms. Boyer's treatment plan. Well, if it was her responsibility, why do we keep on seeing him in the record rendering medical care to her? Well, it's important to note that never did a nurse schedule an appointment for Ms. Boyer with Dr. Lacey. What happened on a couple of additional occasions is that a nurse was seeing Ms. Boyer because there are nurse appointments which are separate from physician appointments. So while a nurse was seeing her, the nurse decided to consult Dr. Lacey. Why Dr. Lacey? Well, that tells us that Dr. Lacey was available, and the nurse trusted his judgment and found him open and willing to answer questions. Was Dr. Johnson available at that time? Was she with another patient? We don't really know, but Dr. Johnson was the one who should have had the treatment plan, ordered the follow-up, seen her again, made sure she was healing, decided whether she needed a referral or not, and that didn't happen. How many times does the record reflect Dr. Johnson saw her? She saw her one time initially, and then she saw her while she was in the infirmary on other occasions later down the road, yes. Does the record not then reflect that Dr. Lacey gave the predominant number of orders for her medical care? Dr. Lacey gave mostly verbal orders based on what nurses told him, and most of the time that was... But nonetheless, they were his orders. And one of them was to please two times schedule her to see a medical provider. The first time, that was Dr. Johnson, who was responsible for assessing her and determining her treatment plan. The second time he made that instruction, there is no provider appointment. So it doesn't appear that that order was followed. It doesn't appear that the nurse actually scheduled her to see a provider. And he sees her, correct? No, he never had an appointment with her. He never saw her. On April 10th, he did a chart review. And what we don't know for sure is what sparked that chart review, whether a nurse noticed that she hadn't had a follow-up, whether it was in his mind after the discussion on April 3rd. Something made him say, you know what, I'm going to look at this patient's chart. And when he did that, he saw that there had been no follow-up x-ray, no follow-up appointment, and he was very alarmed. And so at that time, he ordered the follow-up x-ray. And based on the results of that x-ray, he referred Ms. Boyer to the orthopedic surgeon, Dr. Ikram, who recommended a shoulder specialist. So Dr. Lacy then made sure that that happened as well. One of the times it was Dr. Chitt in the infirmary who made the referral request. But Dr. Lacy made sure that she did get that follow-up care once he became aware that Dr. Johnson hadn't been handling it. But in a 1983 case, it's of crucial importance what the defendant knew. So what Dr. Lacy actually knew was the situation he was confronted with on each occasion, which throughout most of this time period was a nurse saying, Hey, Dr. Lacy, here's the situation. What should we do at this time? And he would give instructions like order medication, order a personal aid, order short-term orders until she could have an appointment with a medical service provider. Is it your brief that alerted us that Ms. Boyer saw she was cared for by five nurses and eight doctors? Where did I get that? Well, she was cared for by five out of six of the physicians at the facility during the time she was there. I'm not sure how many nurses. That might have been in the judge's opinion. It might have been in the judge's opinion, five nurses and eight doctors, which would have been the specialists. Yes, including specialists. The concern when you see that kind of record is that the standard here is deliberate indifference. And can you have an organization that's run in a way that no one ever sees the same person twice and so no one really knows what's going on and the person just falls between the cracks? And that's a question of indifference, isn't it? And I guess my concern about the record is I'm looking at who is actually doing things for this woman, and it's Dr. Lacy. I know nurses may be the ones contacting him, but the response and the orders are coming from him. I guess I'm just not, I don't find it an adequate response to say there were five nurses and there were six doctors and she saw them all at different times and they all kept different information and so nobody is really in charge of her treatment. And that's okay. And if she had some problem from that, then I'm not deliberately indifferent because I only saw her the first time. And I'm not deliberately indifferent because I only saw her the second time. And it just goes down the row and no one is in charge. So when I see that kind of a record, what I see is who moved in and out the most frequently and ordered the pivotal test and treatment. And my evaluation of this record is that was Dr. Lacy. Now, if you look at Dr. Lacy's testimony, he made it clear that the physician who sees the patient for the condition initially owns that condition. That means that it was Dr. Johnson's responsibility to order a follow-up appointment, follow-up x-rays, and those sorts of things. Well, then why didn't he call Dr. Johnson and say, you're not doing your job, go see this patient, as opposed to actually himself becoming the treating physician? I'm not sure that this was asked of Dr. Lacy. I believe, based on what I know of this case, that he lacked some confidence in Dr. Johnson and the way that she had handled the situation, he was more comfortable taking action himself at that point. So he was more comfortable himself rendering her treatment. After it became apparent to him that Dr. Johnson hadn't done it, which was at the time that he then ordered a follow-up x-ray and then ordered the orthopedic evaluation. Being a prisoner is quite different than being out in the public and having your own personal doc, etc. But the case law with respect to the Eighth Amendment claims in a prison setting, are they instructive to the court? Is that in your brief to tell us whether the standard of care is different? The standard of care is different. The cases that you would most point us to as most instructive for your side of this case would be which? Well, I think that one key case, and this goes to whether the appellant can show that she was harmed, is the Napier case, which requires the appellant to show that there was harm suffered as the result of a delay in getting adequate medical care. Because here we definitely have a situation where care has been provided. She was promptly sent to the emergency room. There were certain steps taken immediately, even upon her return to the prison then. And so the question is, was the care provided so inadequate that it caused her additional harm? And what we have in the evidence does not show that it does. What's your best evidence that not that I would not have operated on her, because that's not the issue. What's your best evidence that the arm that she ended up with healed the way it did is not evidence that she suffered a harm as a result of the failure of treatment? There are a couple of things. One is that even before Ms. Boyer went to prison, she had many of the same complaints about having difficulty using that arm. Second, her last appointment with Dr. Walper before leaving prison, he found that her healing was fairly complete, she had minimal pain, and she should have a fairly functional shoulder, which is very different from what Ms. Boyer later on in this litigation, once this litigation was going on, was saying her condition was. But doesn't her physician say that she has a frozen shoulder? He does, and this was also, you know, she fell on the ice at least twice after prison, so we know that she did suffer some additional injury. After the first time she fell on the ice, she said that the pain in her shoulder was ungodly. Her primary care physician did refer her to an orthopedic surgeon, but she never saw one, so we didn't know whether she had indeed suffered a new injury. What was the testimony with respect to why she didn't see one? I think there was an issue with her being able to get an appointment because of her insurance or lack of insurance or her situation. Because she couldn't afford it. That's probably true, yes. I guess I'm struggling with the fact that, you know, in law school you're taught you take your plaintiffs as you find them. And if you have an eggshell, skull plaintiff that you hit and they're harmed more than someone else might have been, then that's the plaintiff that you have. And here you have a woman who did have some background. I think that's conceded in the record. But the question is whether the four fractures and not matching healing is a harm that resulted from the failure to take the medical advice to have her viewed earlier. That might have been surgery, but it might have been you've got to put her in a binding and she's got to wear it because if she doesn't, it's not going to heal appropriately, which I think the record is fairly clear that it didn't. And, you know, even if she injured it again, that still begs the question because was it more injurable because it was frozen? I mean, we don't know. Those are questions that relate to issues of fact that would have to be determined. So, you know, I guess I would just say to you, you know, that would say that this is not a harm. Well, I've cited a number of cases in the brief regarding what is to be considered, and the number one case that I like to quote. Do you remember the facts or something? Because we'll search for it. It's the one, it might be Gerritsen, that says that when you have multiple participants, you have to look at that individual's involvement, what they knew, what they did, separate from any mistakes that anyone else made. That answers it. Yes. Scientifically. If I could just make one closing remark. I don't think that anyone would be looking at Dr. Lacey if the plaintiff had chosen to sue Dr. Johnson. And I think it's troubling that because an appellant chose to sue Dr. Lacey out of the various people involved, nurses, doctors, that anything that could have gone wrong somehow comes back to him when, if you look at each time he was involved, he did further her care each time. And I don't think there's any evidence of deliberate indifference whatsoever when you stop and look at each involvement. Thank you. Counsel, we have your argument. Thank you. Thank you very much. We believe, of course, that there was evidence of deliberate indifference. Dr. Lacey never denied he wasn't the medical director. He never denied that, in fact, when one of the nurses brought to his attention that Mrs. Boyer's body was completely black because she had some internal bleeding and they wanted him to look at it, he said, no, that's completely normal. That's completely normal. And I think if my body were completely black because there was internal bleeding, what would that tell me? I'm bleeding. Where? Has it stopped? Will it continue? Is there some medical testimony with respect to that? Absolutely. By your expert? Not by our expert, but the medical, Judge Cook, the nurse brought, this is in the medical records, which are incorporated in our rules, the nurse brought to his attention the fact that her body was black from bleeding, and he said, I don't need to see her, that's completely normal. How about that? Okay. So do we have medical testimony about how that affected her? I don't know if we have medical testimony. It sounds dreadful, but do we know whether it's just ugly, like a bruise that none of us likes, or that it ended up having a serious effect? Well, I can tell you one thing. It is reasonable to assume that since she had bone breaks. Again, it's an assumption. So that's the answer. Tell me the next part of your argument. I get that we can assume it. I just ask if there was medical testimony. Yes, there is medical testimony because it's clear she's in pain. Okay. And bleeding from bones causes pain. Dr. Frew, any medical physician will tell you. Well, it sounds awful. No, but it creates pain, too. It doesn't just look bad. It hurts. And she did complain about pain. And as you may know, they did give her some meds. And then they switched them to Tylenol. And you know what you have to do if you get Tylenol in the prison? You have to pay for it yourself. And you have to wait three weeks until the prescription is filled. So these, you know, in other words, there's a continuous stack of things that mean that the trial judge ignored our opportunity to have a credibility assessment on the part of the jury of these facts. You know, in, say, labor and employment law, there's a tension between employers and employees. And there are boundaries set by the National League Relations Act and the Civil Rights Act and so forth and regulatory agencies. But in a prison setting, there is nothing except the Eighth Amendment to protect a prisoner from an unconstitutional violation. And so we ask for an opportunity to allow a jury to look at Dr. Lacey's behavior and the failure for him to follow the proper care for her. And we believe we can prove deliberate indifference, but we have enough proof, enough evidence, we should at least be able to take this to a jury. So thank you so much. Thanks for your good questions. Thank you, Ms. Kierbaum. Kienbaum. Kienbaum. There I made a shot and I missed it. Anyway, thank you both for your argument. You're welcome. We'll consider your case.